Good morning. Our first case is number 22-9001, Robert Wharton v. Superintendent. Mr. Lev? Good morning, your honors. May it please the court, I would like to reserve three minutes of my time for rebuttal. Granted. Bob Wharton's prison records between his two sentencings show significant positive adjustment and good behavior. It shows no incidents of violence, assault, or threatening behavior. It shows positive monthly reports from the PRC, good relationships with his counselor, positive yearly reports from his housing supervisors that he's meeting his goals, he participates in activities, he advocates for himself appropriately within the prison, he maintains his family relationships. All of that is positive, as even the amicus experts recognized in their testimony below. There is, of course, negative behavior, significant negative behavior. There are the two misconducts from 1989 for possessions of contraband, implements of escape, where he had the pieces of broken antenna, one of which was fashioned into the shape of a handcuff key, and then there's the escape from City Hall in 1985 when he was still in county custody. I think one thing that's important is to look at what happened to Mr. Wharton after the 1989 misconducts. He was adjudicated on those and given 180 days of disciplinary time. He served his disciplinary time with good behavior, and then when he was released from his disciplinary time, for the next three and a half years, his behavior was exemplary. He had in those three and a half years only one minor misconduct that didn't result in any punishment but just a warning. It's the kind of behavior that shows the growth and maturation of a young prisoner. And remember, Mr. Wharton was only 21 when he committed these offenses and was still in his early 20s when he went to state custody. The kind of growth and maturation that both the corrections experts said that they hoped to see in prisoners, that's what corrections people want to see. People come into prison, they mature, they adjust, they learn to adjust and accept what's happening, and they live their lives peacefully, and that's what Mr. Wharton did. So the evidence cuts both ways, right? There's positive aspects of it and there's negative aspects of it. And cuts both ways means that people can either view it all positively or view it negatively. People can find some might say that the positives outweigh the negatives. Others might think that the negatives outweigh the positives. That's what cuts both ways means, right? In any situation, in the court of law or out in the community, if something cuts both ways, it means people can see it from different perspectives. We have to decide how much it cuts each way, right? I'm sorry? We have to decide how much it cuts each way. That's the task at hand. I'm sorry for that argument. I'm not hearing you clearly. I'm sorry. Don't we have to evaluate how much it cuts each way? It's not enough to say that there's some evidence going one way and some evidence going the other way. I think you have to evaluate what a reasonable, what any reasonable juror could do. And what I'm suggesting to here is because that's the prejudice standard. Is there a reasonable probability that one juror, that only a single juror could have viewed it positively and voted for life? And so even if you think that most people would find that the negatives outweigh and that the court feels the negatives outweigh, that doesn't answer the prejudice issue. The prejudice issue is any single juror. And when evidence cuts both ways, and here you have, for example, qualified experts on both sides viewing the same facts and reaching different conclusions. We have to look at this in light of what was argued to the jury, and he didn't have a lot to mitigate here. The bulk of the closing argument is attacking various witnesses. Then there was a plea for mercy. But the substantive argument that was made twice on two pages of the transcript was, he's going to spend the rest of his life in prison. So doesn't that suggest that whatever other positive things there are, the negative here would have torpedoed that, and any lawyer in his right mind would not open the door to bringing that in? Well, that's certainly not what Mr. Cannon testified to. What he subjectively was thinking. But Strickland is an objective standard. But it's an objective standard based on what counsel says is his strategy at the time. Okay. Well, if someone overlooks a strategy, but a reasonable lawyer would not take that strategy, then it's not or a range of options and one of the reasonable options not take that strategy, then it's not even division performance. I would agree with you. Right? Different lawyers could have taken different strategies had they investigated, had they uncovered the evidence and uncovered the records. Some lawyers might have said, I'm not going to introduce that. And if that were the situation here, I would have a very, very difficult time arguing to this court that that was an unreasonable decision to make. But other lawyers could say, no. I'm introducing family testimony that shows that Mr. Wharton has a history of being a good person, a loving person, that that history has continued after his incarceration. I've introduced witnesses who said that he's maintained his relationships after incarceration. His behavior, particularly his behavior for the last three and a half years before the sentencing, as he's matured, that exemplary behavior to me balances out my mitigation and fits in with my mitigation. Okay. So different lawyers could have different strategies. I think you've now conceded that maybe this isn't division performance because Strickland requires showing that it could not have been tactical, that an objective lawyer, you know, could have chosen to bypass something. And it doesn't matter if he was subjectively overlooking it. His testimony on that is not enough. If you say some reasonable lawyers would have just stayed far away from this, saying the cons outweigh the pros. But that's not what the Supreme Court did in the Hinton case. It looked at counsel's ignorance of the law. That's not what this court just did in the Rogers case where it said counsel, where counsel is ignorant of the law, that fails to meet an objective standard of reasonableness. And you can't say that counsel made reasonable decisions when they're based on ignorance of the law. Hence, in Rogers, there was no reason not to point the finger at somebody else. Here there's a very good reason not to blame, not to go down that road. So ignorance of the point of law, fundamental to his case and basic research, you know, that's a general rule. But the question is, would a reasonable lawyer have gone, would every reasonable lawyer have gone down this road? And I think as well, this court has already given a large part of that answer in its remand opinion. In its remand opinion, it said counsel had a duty to obtain the prison records, and that if he failed to, if he negligently failed to obtain those records, that would be below an objective level of performance. So your point in response to Judge Beavis' question about the performance problem is really, it was the failure to investigate and to see what these records might yield as opposed to that maybe more strategic decision that could come later with the benefit of those records. And if I understand what you're saying, you're saying that counsel was deprived of the ability, deprived himself of the ability, to make an informed strategic decision later by not doing the investigation in light of Skipper. Is that roughly where you are on the performance? That's roughly where I am. That's correct. But I also have the next layer of that counsel testified that if he had obtained those records, he would have used them at the sentencing because he believed that they were consistent with his theory of mitigation and that the positives outweighed the negatives. In terms of at times in the briefing there's this notion that even putting the positive aspects on would not have opened the door to the negative. It strikes me that it would. It strikes me that if you're going to say, hey, we've got all of this evidence. We're opening the door of prison adjustment. There's very, very, very little evidence, if any, of prison adjustment put into the record in 1992. The jury asked about it. Could we consider this? Not sure there was too much at all. And so now we're in a situation of, well, wouldn't it open the door? And some of the briefing says it wouldn't. And the answer is we don't know how much it would have opened the door. It certainly would have opened the door. And I have no question that it would have opened the door to the 1989 misconducts that occurred while he was in state custody. No question. They come in. But there are questions about, and Mr. Cannon testified to that at the time of the hearing, about whether the escape would have necessarily come in. But what legal principle would divide between county custody and state custody for purposes of a prison adjustment analysis? The vibe is state custody is far more secure. It's geared towards long-term secure incarceration. And, in fact, the experts, both the corrections experts, testified to that, that even the amicus experts said that Dr. Beard said that there are secure maximum security prisons in Pennsylvania that could safely house Mr. Wharton. And so there's a huge difference. But as far as his adjustment, doesn't that almost cut the other way in the sense of when it's very, very strict, he follows the rules? When it's a little more lax, he doesn't? That almost suggests that he's not adjusting. It's the rules that are driving the behavior, not his own volition. I think what it shows is that his behavior in state custody showed this growth and maturation over the years. With stricter rules. With stricter rules. So that he learned to adjust to the rules. And that's what prison is for. That's what prison does. Yes, he was wilder when he was younger. But not now. That's why the prison mitigation evidence is so important. Because it shows that it allows a juror to show a change in behavior, right, that may tip the scales in favor of a life sentence. A minute ago you said it would open the door, the escape evidence would be allowed to some extent. Can you elaborate on that, to what extent? Well, certainly the two may, excuse me just a second. Certainly the two misconducts in 1989 would have been admissible. Because they're serious misconducts, they're significant evidence of misbehavior. So there's no doubt in your mind that would have been part of the evidentiary proffer. That would have been part of the evidentiary process. That's the opposite of what the DA's arguing. Are you familiar with the DA's briefing in this case or the companion case? I'm familiar with it, yes, sir. So the argument there seems to be that, well, the escape evidence, including the escape at the county, was of no moment. And we know that because the district attorney's office in the 80s and the 90s didn't put any of that evidence in. What's your view of that? No, and I agree with that. And I'm distinguishing. Well, if it's of no moment, then it's not coming in. And you're saying it's coming in. Which is it? I'm distinguishing between the two misconducts in 1989 while in state custody. Well, the DA's office didn't bring in the state custody misconducts either. And the escape in 1985 from City Hall. All right, but the misconducts while Mr. Wharton was in the administrative custody or the restrictive housing unit, those weren't put into evidence either by the DA's office back in 92. They were in the records that were presented to the district court and to this court the first time around. So in the remand opinion. But was it argued to the jury in the 92 sensing? No. Well, then, so it was of no moment then. Or was it not admissible because the door was not open? No, and I hope I'm following you, Judge Hardiman. What we're saying is if counsel had presented, so in 1992, counsel didn't have these records and didn't present any evidence of positive adjustment. So what we're looking at is what would have happened if he had the records, right? To determine prejudice, we have to look at all of the evidence of what could have been presented on both sides. So if he had the records, he could have presented the evidence. Mr. Wharton's nonviolence and good adjustment and positive reports. What if the DA's office had the records? Could the DA's office have just offensively put in that evidence without the door being open? In 1992, if I don't believe they could have put it in without the defense counsel putting in evidence of positive. But maybe they could have because it's an interesting question because the defense did present testimony from one of Mr. Wharton's family members about her relationship with him that began after his arrest and incarceration. So maybe it would have been relevant. It could have been argued that it was relevant to rebut that testimony. They certainly didn't do that or try to do that in 1992. And they certainly didn't try to put the escape in in 1992. Well, the escape would have been heavily prejudicial if the door hadn't been open, right? Especially considering that he was escaping while in court on a different conviction for an unrelated crime. It might have been, but it also might have been relevant to an aggravating circumstance of prior significant history of criminal behavior involving violence or the threat of violence. They chose not to do that. They didn't even try. They certainly could have asked the judge for permission, and the judge would have had to make a ruling. They didn't even try. And more than that, so I think I agree with my friend at the district attorney's office that for these purposes today, when we're weighing how a single juror might have reacted to the positive and the negative evidence here, that the escape, the heavy reliance the district court puts on the escape, is diminished by the fact that the district attorney's office, for the years of litigating this, when they argued in this court, their head note of their brief in this court in the prior appeal was, counsel was not ineffective because the positive evidence would have opened the door to negative evidence. And they did not argue that the escape was part of that negative evidence. That would have opened the door. So there's a real question here about how relevant the escape is and about what role it would have played. And, again, we have to look at this from the one juror standard. So in order to reject. Let's imagine you're right. I'm skeptical. Let's imagine you're right that this was deficient performance. Let's imagine that the escape stays out. But you want to say, well, he had good performance in prison, except you agree that the keys would come in.